Good morning, Your Honors. Mary E. Broadhurst appearing on behalf of Defendants of Hullett's Parents of E.H. I wish to reserve three minutes and I will watch the time. This case arises under the Individuals with Disabilities Education Act, commonly known as the IDEA. E.H. was a student in the district whose social and emotional concerns involving peer interactions go back to when she was in the third grade. By the fifth grade, teased and ostracized by peers, she began having migraine headaches and was diagnosed with anxiety and depression. In the seventh grade, she was hospitalized due to severe depression and suicidal ideation. The district, in contemporaneous notes, found in Janelle Walton's psychoeducational evaluation at the end of E.H.'s eighth grade school year, and that's excerpt of Record 28, acknowledged that her social and emotional challenges made it difficult for her to attend school on a regular basis, and also that her teachers reported that she was shy, timid, and withdrawn at school, and that she displayed extreme mood swings. She cried easily. Counsel, I think we're pretty familiar with the facts. We are reviewing the order of the case. Do you agree? Yes, absolutely. All right. And so tell us, in your view, how Judge Panner abused his discretion in ruling the way he did. Well, first off, courts have utilized a three-step test for determining whether or not reimbursement in IDEA cases should be granted to parents. And Judge Panner did not use that three-step test at all. Judge Panner went immediately to the equitable relief section. Now, what is the three-step? What's the source of the three-step test? The first comes from the Rowley case, the United States Supreme Court, wherein the question is whether or not the district has afforded the child a free and appropriate public education. And there's actually two steps of that. The IEP, did the district follow the procedures in the development of the IEP? And then the second question is, was that IEP reasonable to afford the child, reasonably calculated to afford the child meaningful educational benefits? So on that first part of the test, did the district offer a free and appropriate public education, Judge Panner doesn't really address that, except when he's talking about the equitable relief, in one summary, just one sentence, he concludes that this placement was not made for educational purposes, that it was made for medical purposes. Do you agree that there's a distinction between the two? I'm sorry, could you repeat? Do you agree that there's a distinction between educational and medical? Absolutely. What's the test? The Clovis Court has addressed that test. They propose, this was a Ninth Circuit of Appeals case in Clovis, they proposed three possible tests. And the first was whether or not it was supportive of the child's education. The second test was where the medical, social or emotional problems that require hospitalization are intertwined with educational problems. I'll point out here that the child was not placed in a, we are not asking for reimbursement for a hospitalization. The third test that Clovis put forth was whether the placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social or emotional problems that are quite necessary separate from the learning issues. What here dictated residential? What dictated the need for residential for educational purposes? This student's social and emotional concerns, as I was beginning to recite to the court, goes way back. And it involved her inability to attend classes, her inability to have socialization experiences at the school. She missed a lot of school due to migraines. The migraines were found to be related to her social skill deficits. And when you look at the district's contemporaneous records from back when this child first became aware, to the district, the district first became aware of her issues, they saw her as having some pretty significant social needs at that point. The ALJ in this case actually did apply the three tests that Clovis put forth. And he held that the district failed to offer EH with a free and appropriate public education. The district court, on the other hand, does not address any of these tests. And without any analysis at all of the testimony in the record, just concluded this placement was made for medical reasons and not for educational reasons. Now, the Ninth Circuit Court of Appeals has addressed what is education. They've addressed specifically the term educational needs. And they have concluded, and this was in the County of San Diego case, and it was also in the Seattle versus BS case, that the term education is a broad term which includes not only academics, but it includes the school behavior as well as socialization. But now, what about Clovis? Clovis held in that case that it was medical. Yes. Clovis applying, I believe, primarily the third test that Clovis spoke about, then came to the conclusion that in that specific case, the child was placed into a hospital, a psychiatric hospital, where there was no schooling happening at the program itself. The school district in the facility or the school district in the area sent somebody in. So they said, you know, this was very different. The child during the day was receiving very little education. The majority of the time was spent in psychiatric, psychological treatment programs. And so this case is very different. The case here before the court is very different from the child in Clovis in that this child had been hospitalized, but at this point she was placed into a program that was accredited by that state as a program that could address educational needs of students with disabilities. And in this case, the child's needs could not be separated. They were not wholly apart from her educational issues. This child was unable to attend school. The record indicates that when her social functioning improved, her migraines were reduced. So in order to allow this child full access to her educational experience, it was necessary to address the education, the underlying social and emotional concerns that the student had. But did the parents ever suggest, I mean, the school district here provided home tutoring for a while, and then she was integrated back into school, as I recall. Actually, the home tutoring happened as they were looking for, it's the beginning of her high school year. Right. There's an IEP meeting. The parents say, yes, this is fine, but we're looking for a residential placement because we've been advised by everybody that's been working with this kid, the people at the hospitals, her own therapist, that she needs residential treatment. We're looking for residential treatment. We'll, you know, get her to school as much as we can. Where's the evidence that these other people were recommending residential treatment? That evidence is all in the records, Your Honor. It included the Dr. Crombie from the Emanuel Hospital. It included her own therapist. I believe the woman's name was Lissinsky. And these folks were saying that what was needed at this point was a residential placement. So why? To deal with the combined, and especially if you look at Dr. Crombie's reports from Emanuel Hospital, who has no interest in the outcome of this case. He says that this child, he gives a list of diagnoses, including anxiety disorder, depression, separation disorder. And he says these diagnoses, these issues cannot be separated from her cognitive and academic needs, that they are one and the same. I guess I'm looking. I thought in November of 2004 the parents were the ones requesting the tutor. That was not made very clear in the record. What happened was the IEP meeting was held in September. And the school district wrote on the IEP that if there was going to be homebound instruction, because they anticipated it might happen, that they would convene another IEP meeting. The child then was unable to come to school due to migraines. The parents asked for tutoring, although the record is not clear on that, in that the district offered tutoring. And so there was this ‑‑ Just a second. As I understand it, there was a meeting in September 2004. The reason they had to have that meeting is because Willow Wind would not take EH. Then they added four classes to her schedule, 30 minutes per day in classes, and other accommodations and modifications, and they had a detailed safety plan, and everybody agreed to that. But after that, in November, the parents requested the tutor, and then the district agreed that they would give her a tutor, and then all instruction was provided by the tutor. And then in December of 2004, EH shoved her sister into traffic. And with that, she went to a doctor for further evaluation, but nobody indicated to the district that education was not what they wanted, even then. And, in fact, in January 2005, without any notification to the district, the parents unilaterally placed her in the youth care. And the school district continued to provide the tutoring. And they told the tutor they were completely satisfied with the school's services. That's the way I read the record. Your Honor, I don't think ‑‑ again, I do not believe the record is clear as to whether or not the hearing officer ever found who requested the home tutoring happen. The district did provide the home tutoring. I don't see that as a major issue here. I think the facts that are bothering you is that the school district did not have notice at that time that the parents were asking the district to pay for a residential placement. Well, I guess the reason that I'm into this kind of a little bit is that I want you to step back a little bit. I'm worried about the standard of review here. What standard of review does the district court have for the ALJ? The standard of review for the ALJ is one that is based on the record with pretty high deference to the ‑‑ What does it say? How much deference? Well, the deference is based ‑‑ the discretion is given to the district court to decide how much deference. In cases where there are detailed findings of fact, where the hearing officer has asked questions as well on the record, in those cases the courts have traditionally given a higher standard of deference to the ALJ's record. Here we have a case involving some credibility rulings that the ALJ made that, again, the district court does not address at all in coming to a distinctly different conclusion than the ALJ. Now, is that consistent with our TA case, which you may know something about? Is what consistent, Your Honor? Your response? The standard of review? I was going to ask the same question. Do you really think what you've just said is consistent with TA? I think what the TA court said in the Ninth Circuit was that the Ninth Circuit court will review the district court of appeal's opinion and not the ALJ's opinion. However, inherent in that, my argument is that in order for the court to review the district court's opinion, it must look to see whether or not the district court employed the correct standard of review. Because if not, it's not fulfilling its obligation under the Rowley court, which clearly said that you're to give deference to the hearing officer's opinion. So if you have a court that — a district court that goes widely away from that, comes up with its own findings, and you just review their case without looking at, did the district court review this case correctly? Well, my worry is, as to the district court, the only place I should get into a de novo review are questions of law. And that otherwise, I look at for clear error. And therefore, if I look at this district court's opinion, and I look at any time he applies the law as to this particular situation, I should think about whether he's done it correctly, because I know how to apply the law as well as he does. But where he's trying to determine out and ferret out the facts, that I say, unless he's made a clear error, I should not get involved. Well, he has made a clear error when he's ignoring credibility rulings. On what basis does he find that — Well, but frankly, I don't think he ignored the credibility rulings so much as he said, I don't know why in this situation I should believe these people more than I believe others in that particular situation. Because he said those who come in to testify are certainly benefited by the fact they come up with the testimony they did, whereas others do not. In the E.H. case, there was no discussion about the witness's testimony whatsoever. All right. Well, he said, as I understand it, what he was really suggesting, even in this case and I realize that reading at his particular situation, he really said, I don't know why I should give deference to that testimony. Again, Your Honor, the word testimony, I do not believe, shows up. Well, I — okay. I'll back off. I don't think he said testimony. But he asked to weigh that particular testimony that was given to the ALJ. And if he's going to ignore credibility findings, he needs to address why. Okay. I understand your argument. I'll reserve my time. Very well, counsel. We'll hear from the school district. Your Honors, my name is Andrea Hungerford, and I'm representing the Ashland School District. And instead of working off of prepared remarks, I'm going to jump into some of the issues that you've expressed some interest in. The first is I did want to comment on the standard of review, because the Ninth Circuit and TA did not only speak to what standard of review it should exercise over the district court. It specifically said, no case supports TA's contention that we review the hearing officer's decision for abuse of discretion. So I think that the Ninth Circuit has spoken both to the fact that it reviews the including in these equities balancing cases, but also that it's not appropriate to have such a broad standard of review for the district court over the ALJ. The next issue that I wanted to take up was the parent's statement at the IEP meeting that Ms. Broadhurst mentioned, that they were looking for residential placement. In fact, the ALJ's own findings were that they informed the team they were looking for residential placement because student was suicidal. They did not object to what was proposed, nor request reimbursement for residential placement. At no time during the important period here, the fall of 2004, did the parents ever say to the district, we don't think you're providing adequate educational services. We have concerns that this is not enough educationally, that our reasons for residential are educational in nature. And when in November she was pulled out, the only problem she was having was attendance. Ms. Broadhurst made reference to social problems as well. There's truth that in the record as a whole, since she was in third grade, she had experienced social difficulties off and on. But the testimony from school staff in the fall of 2004, at the time she was in third grade, she did not have social difficulties at school. She did not have peer problems at school. Her problem was that her attendance had really plummeted in November. And the mother told the district the reason that she needs a home tutor and her attendance is poor is because she's suffering from migraines. The district clearly understood this to be a medical issue. In fact, the vice principal emailed around to staff to let them know that she'd be getting tutoring on a short-term basis and he referred to it as a medical issue of migraines. And this is not just an instance where there's a lack of notice before the parents pull her. The parents then did not provide any notice whatsoever for almost eight months after she had been placed residentially. In my research, I was not able to find a single case nationwide where after such a significant lapse of time for any notice, reimbursement was ultimately granted. Ms. Broadhurst also referred to the, quote, experts recommending that she be residentially placed. However, if you look at the excerpts of record, those experts, the folks who saw her when she was hospitalized in August and again in December of 2004, both for home reasons, not school reasons. In August of 2004, she wasn't even in school. In December of 2004, she was in home tutoring at the time she was hospitalized, and it was because of pushing her sister into traffic and going after her dad with a knife. But if you look in volume two of defendant's excerpts of record, it's ER 112, this is the discharge summary after she's been hospitalized in December. This was only weeks before parents unilaterally placed her. All of the discussion here from the treating physician is about the family. The family appeared to accept an intellectual invitation to reward age appropriate functioning slash desired behaviors and consciously avoid reinforcing somatic symptoms, self-handicapping strategies, or any other undesired processes. However, emotionally, the family may have resisted this invitation. This suggests they should utilize family cognitive therapy with the ultimate goal of moving them from a family that nurtures and unwittingly reinforces self-handicapping strategies and somatic symptoms. The first target for therapy would be finding some way of increasing any reinforcement for HOPE's appropriate expressions of frustration and any identifiable desired functioning behaviors. These medical professionals never had any contact with the school. They never cite to any school-specific problems. They are making recommendations for residential placement both in the August discharge and in the December discharge for home problems. And- Counsel, what about this placement in Youth Care, which is a private out-of-state residential treatment program? If I understood Ms. Broadhurst's argument, she's suggesting that that was not for medical reasons. As a matter of fact, that program is heavily educational. What do we do with that? Well, first of all, you have to understand that with Youth Care, there are actually multiple branches to the Youth Care facility. The first branch, where she was initially placed for the first six months, actually was a psychiatric facility. And she was not placed into Pine Ridge, which is what they call their high school program. She didn't start attending at Pine Ridge until June or July. She was placed in January. And the record straight from the ALJ's record and the administrative record says reveals that she was so medicated from January to March that the Youth Care reports say she had daytime sedation, memory problems, continuing depressive symptoms, and that even during June and early July, she spent a significant amount of time in bed with recurring migraines and medications to calm her anxiety, quote, wiped her out. So I think that the administrative record, just because a program offers academic classes, I mean, even hospitals offer some form of academic tutoring classes, ability to earn credits toward high school. But the mere fact that that's what was available at Youth Care does not change the fact that it was a psychiatric facility that much of the time was spent working on her medications and that she really did not receive or benefit from much educational services for at least those first six months and even into June and July. How do you draw the line between medical need and educational need for the purposes of determining whether the school district owes appropriate education such as a residential program? Well, and I think that it's not only just a matter of, I've got so many notes I can't find them, of drawing the line, for instance, in County of San Diego, it says that they look at whether the primary problems were educationally related. And they say placement wasn't, was placement made primarily to aid the student to benefit from special education. And that's at County of San Diego at 1468. And of course, from Clovis, as we've previously discussed, it's whether the placement was necessary in order for the child to obtain educational benefit. And except for her absences, which were based on her migraines, she was obtaining educational benefit up until the time that the parent requested home tutoring. She was making progress toward her IEP goals. The school staff testified to this. She didn't have any behavior problems. She wasn't suspended. She wasn't getting referred. And she was making academic gains. She had grades from A's to D's, but was passing all of her classes up until when she started having those attendance problems. I think that the only way you can answer that question is you compare this case with something like the Seattle case, where the student is having huge behavioral outbursts at school. Is throwing things through windows, is physically assaulting staff. And the school is saying, we don't even know how to provide educational services to this student. His behaviors and his emotional problems are so severe that we're not able to educate him. But, you know, I think it's a really important question, because many things impact students educationally. If a student is drug addicted, they're not going to be able to obtain educational benefit. But are schools obligated to give them drug treatment? If a student is abused or not adequately cared for at home, likely you will see an educational impact. But does that mean that schools are obligated to address that issue because the student happens to have a disability? I'm trying to get you to tell me to distinguish the two situations. One where the situation is such that it's not primarily an educational problem, and the district doesn't have an obligation. And where the condition interferes with education, and therefore the school's got to do something. I think the best I can do is to say that in this case, where the student is not so disabled by her emotional, social, and behavioral issues, that she's not able to make educational progress when she's medically able to attend school, that there's no basis for finding that it was an educational need that drove her to youth care. None of the hospital providers reference an educational need. The parents didn't for almost eight months. There's no evidence in the record that speaks to the idea that her disability, her other health impairment, for which she was identified under IDEA, rendered her unable to make progress in a school setting. I know that that, I mean, I wish I could do better. But in this case, at least, you've got, you can also look at what she was provided when she went to youth care. For the first six months, it was largely psychiatric in nature. It focused on individual counseling and family counseling and medication regimens, and it did not focus on, you know, that she was needed substantially different things educationally than she had been getting at school. Very well. Anything further? If I could. Oh, sorry, there's a question. If I could, on standard or review. Yes. The biggest problem that I have with this particular situation is the standard or review as it relates to how I deal with the district court and how the district court deals with the ALJ. And frankly, my questions to counsel were basically regarding that standard or review. Now, my standard or review, as I understand it, is one where I give discretion to the district court. I'm looking for an abuse of discretion, really, unless they apply the law right, how wrongly, and in essence, I'm really looking at how much do I have to review what the district court does with the ALJ's decision? Would you comment on that? Because I really believe that that is the big point that counsel makes here. He says there are three tests that they should have determined, that the ALJ went through the tests and the district judge didn't. And so I was trying to question her about the many different ways maybe the district judge really did or didn't, and those were the essence of my question. So how do I make that determination? I mean, that's a real difficult determination for me. I have two thoughts on that. The first is I note that at the beginning of the district court judge's decision, he notes that instead of giving a long recitation of facts, that he's only going to make references to facts in the procedural history as they directly pertain to what he's deciding. So in other words, he's largely accepting the ALJ's facts, but noting that the ALJ applied them incorrectly and applied the law incorrectly in these specific areas. In other words, I don't think that the judge's decision doesn't deserve discretion just because he doesn't give a long reiteration of the facts here. The second thing --- Well, as I understand our case law, it suggests that he has to go through at least what the ALJ has done, giving due weight to it such that I can determine how he looked at it and what he decided about it. Well, of course, it's not due weight. It's giving it the discretion he determines it deserves, which in my reading, it's pretty clear he thinks it doesn't deserve much discretion here, which is why he doesn't spend much time on it. But I wanted to say one other thing about the three tests before I run out of time here. I do not believe it's correct that he has to proceed through those tests in any particular order. There were alternative bases on which he could have ruled in this case. If he had found that the district had provided FAPE, then that would have been one basis for reversing the ALJ. But balancing the equities was another basis for reversing the ALJ. If this Court decided that he inaccurately balanced the equities, I think it would have to go back to the Court to determine the FAPE issue. Because even if the equities favor the parents, if the district was providing a FAPE, there's no reimbursement available. So to that degree, I think it's a little odd that he somewhat put the cart before the horse. But I don't think it's to the degree that it's an abuse of discretion.    But I don't think it's to the degree that it's an abuse of discretion. Thank you, counsel. Oh, sorry. So in your mind, he did not address the FAPE issue? I do not believe that he clearly addressed the FAPE issue, no. I also don't believe that he had to, to reach the decision that he reached. Thank you. Thank you, counsel. Ms. Broadhurst, you have a little bit of time. Thank you, Your Honor. A tiny bit of time. Very little. As this record is complete in this case, the district does not argue with the findings of fact of the ALJ. They are not in dispute for reasons of judicial economy. We request that this case not be remanded back to the district court, but that this panel reverse the district court's decision and reestate the ALJ's decision. Thank you, Your Honor. Thank you, counsel. The case just argued will be submitted for decision.
judges: Whyte, O'scannlain, Smith M.